**MT. MORRIS DISTRIBUTING CORPORA-TION v. DORAN, Prohibition Com'r.**

District Court, S. D. New York. June 19, 1929.

See also 36 F.(2d) 489.

Harry S. Hall and Bernard Kovner, both of New York City, for plaintiff.

Charles H. Tuttle, U. S. Atty., and U. S. Grant, Asst. U. S. Atty., both of New York City, for defendants.

**SAME v. MELLON, Secretary of the Treasury, et al.**

District Court, S. D. New York. November 1, 1929.

490

See also 36 F.(2d) 489.

Harry S. Hall and Bernard Kovner, both of New York City, for complainant.

Charles H. Tuttle, U. S. Atty., of New York City, for defendant.

CAFFEY, District Judge. 1. I have examined the whole of the voluminous testimony and numerous exhibits. I have also considered the oral arguments and the briefs. As will appear below, the first suit (E 47/328) cannot be properly disposed of without advance or contemporaneous disposition of the second suit (E 50/243). Indeed, it might be sufficient to confine this statement to the second suit. In view, however, of the wide range of counsel's discussions and of the nature of my conclusions, I deem it appropriate to set forth somewhat at length the grounds which have influenced my action in both suits.

2. Put into plain language, the questions injected into or necessarily implied by the discussions are: (a) whether the plaintiff has been guilty of crookedness; and (b) whether the Prohibition Administrator has been guilty of oppression.

It is of serious consequence that both questions be determined. I have struggled to find a way by which to subject them to full inquiry in the pending litigation. I think that it is impossible to form a confident opinion about them on the merits without seeing the witnesses and taking additional proof. Accordingly, despite the crowded condition of the calendars, I would require a plenary trial if I believed the court vested with power to do that. I feel, however, for reasons hereafter stated, that upon the facts before me I am not authorized to direct such a trial. On the contrary, for like reasons, I am persuaded that the prohibition statute obliges me to decide the cases on what has already been submitted.

3. Since 1925 the plaintiff has conducted in this city a business requiring the use of alcohol. Down to the end of 1928 it had permits. One was for a denaturing plant and the other for an industrial alcohol plant. These will be referred to, however, as a single permit, because it is immaterial in the present controversy how many permits there were.

On August 1, 1928, plaintiff made application for a renewal during 1929. On December 11, 1928, the Prohibition Administrator gave notice of hearing December 28, 1928. On the next day the application was denied.

The officers of the plaintiff attended the hearing. The purport of the testimony was that for several years the business had been unprofitable. Among other things, it was claimed that this was attributable, wholly or partly, to delays by the prohibition officials in approving applications for withdrawals of alcohol in quantities, within the limits of the

permit, so long that the plant was prevented from meeting the needs of its customers. There was also talk of future plans for the plant, but no suggestion of misconduct by the plaintiff.

4. Plaintiff argues that it is entitled to relief in the first suit in substance because, by force of certain regulations, the 1925 permit had been continued and was not properly discontinued by the proceedings held in 1928. The contention is, in effect, that Treasury Decision No. 3925 (modifying T. D. 3773–4), extending the life of the permit until surrender, failure of bond, or revocation after hearing, is valid and that subsequent Regulations 2, article 218, limiting until December 31, 1928, the duration of such an extended permit, is invalid. Without going into details, it is sufficient to say that, on the facts of the instant case, Lion Laboratories v. Campbell (C. C. A. 2) 34 F.(2d) 642, is squarely against the plaintiff. Moreover, even assuming article 218 of Regulations 2 to be invalid, it seems to me that, if the action of the Prohibition Administrator involved in the second suit be sustained, the procedure there adopted was sufficient to comply with the conditions prescribed by Treasury Decision 3925 for terminating a permit whose existence during 1929 depended on that decision. As will shortly appear, I feel bound to uphold the revocation of the permit assailed in the second suit; likewise, I feel that, regardless of what would have been the outcome if the first suit had stood alone, the failure of the second suit will defeat the first suit.

5. Plaintiff next contends that in November, 1928, the Prohibition Administrator approved the application for renewal, but later deleted therefrom his signature evidencing that fact. Inasmuch, however, as the permit so approved was never delivered, the application still remained open and it was within the province of the Prohibition Administrator, if authorized to consider it at all, to act either favorably or unfavorably thereon.

6. With respect to the denaturing plant, on December 29, 1928, the Prohibition Administrator wrote to plaintiff as follows:

"This application has been disapproved for the reason that the records of this office disclose the fact that your company since its inception has been operated at a constant financial loss. Your past operations in denatured alcohol production and distribution also discloses that your company is not in a position to carry on this business legitimately at a profit in view of the market prices of pure and denatured alcohol, the costs of denaturing materials and ordinary overhead and operating cost.

"There is no apparent economic reason, therefore, to authorize the operation of the denaturing plant by your company for the ensuing year."

With respect to the industrial alcohol plant, at the same time, the Prohibition Administrator said that the Commissioner of Prohibition had made no alcoholic production allotment to the plaintiff company for the year 1929, and then added the following:

"It also appears from the records of this office that, although permits had been granted to your company in the past to operate an industrial alcohol plant, operations have not been conducted under the said permits, and your operations during the entire period of time you have been in the business have been conducted at a financial loss. There appears to be no sound economic reason, therefore, for issuing a permit to your company to operate an industrial alcohol plant for the ensuing year."

The notice by the Prohibition Administrator of the hearing on which the conclusions just recited were based contained no intimation, and perhaps the law did not compel the administrator to say, that the financial operations of plaintiff would be considered. The plaintiff was merely told that at the meeting set for December 28, 1928, "you (plaintiff) will be given the opportunity to present any and all evidence you may have bearing upon the merits of this application."

7. After giving due weight to Milillo v. Canfield, 14 F.(2d) 113 (C. C. A. 2), and Yudelson v. Andrews, 25 F.(2d) 80 (C. C. A. 3), relied on by the Prohibition Administrator, I fail to discover, and counsel have not drawn to my attention, any statutory provision which authorizes the prohibition department to exclude a bona fide running business concern from longer conducting a denaturing plant merely for the reason, standing alone and without regard to any other facts, that the concern in the past has not made, or in the opinion of the department in future cannot make, money. Before attributing to Congress intention to grant such large power to executive officials, the language should be very clear.

It is true that continued operation at a loss of a plant employing alcohol might be ground for suspecting that, and for investigating whether, it had misused the alcohol or had been doing something illegitimate. If, however, the officials wished to inquire into a matter of that kind, fairness would seem to

demand a hearing on the subject, of which previous notice had been given that this phase would be taken up. In addition, fair determination would seem likewise to demand a decision on the merits of the claim by the permittee that failure to earn a profit was due to the neglect of government officials promptly to pass on requests of the plant for the approval of withdrawals under its permit.

If all that were now involved were the denial of a 1929 permit upon the ground assigned by the Prohibition Administrator, I should be inclined to award the plaintiff a decree in the first suit, or, at least, following the precedent in Smith v. Foster (D. C.) 15 F. (2d) 115, to send the matter back to the Prohibition Administrator for further consideration. I do not, however, expressly pass on that point, because, in my opinion, the developments of the second suit render it unnecessary for me to do so. Indeed, a decree for plaintiff in the first suit would be futile if concurrently the bill in the second suit were dismissed.

8. The second suit relates to four charges against the plaintiff. These include alleged diversion of alcohol withdrawn under permit, making false records of the alleged use thereof, failure to manufacture specially denatured alcohol in compliance with the approved Treasury Department formula because the wood alcohol (methanol) employed was not of the denaturing grade required by the formula, selling the product so manufactured, falsely reporting for April, 1929, receipt from the Wood Products Company of Buffalo, N. Y., of 30 drums of wood alcohol of denaturing grade, and substituting for the alcohol purchased from that company a substandard article procured elsewhere with the intent to conceal its use. Boiled down, the controversy turns exclusively upon these 30 drums. All the pertinent occurrences happened within a short period during 1929.

9. These facts are undisputed: The plaintiff was an old customer of the Wood Products Company. Shortly prior to March 13 the plaintiff, through the United States Industrial Alcohol Corporation at New York, placed an order with the Wood Products Company for 30 small drums of wood alcohol of denaturing grade. On March 13 the Wood Products Company delivered to the Erie Railroad at Buffalo 30 drums of alcohol for transportation to New York and delivery there to the plaintiff. Thirty drums of alcohol were transported by that line from Buffalo to New York, reaching there on March 16. The railroad company on March 19 turned over to the truckman of plaintiff 30 drums of alcohol. On the same day this truckman, at the instance of the plaintiff, delivered 30 drums of alcohol to the warehouse of the Everard companies in this city, where it was stored for the account of the plaintiff. On or about April 1 (not earlier than March 28), the truckman of the plaintiff withdrew 15 drums and on April 22 withdrew 15 drums of alcohol from the warehouse. On each of the dates April 1 and 22 this truckman delivered 15 drums of alcohol to the plant of the plaintiff, where they immediately went into the storeroom under the control of the government storekeeper gauger stationed at the plant. On the days last mentioned this government official took samples of the alcohol so received and, in accordance with previous practice, delivered them to the Fergerson Laboratories in this city for analysis. On the next days respectively after delivery of the samples, the storekeeper gauger at plaintiff's plant received from Fergerson Laboratories documents approving the samples as wood alcohol of denaturing grade, in compliance with the government standard, which purported to be signed Charles F. Daub. The Fergerson Laboratories had an unrevoked sanction by the government to make analyses for permittees using wood alcohol in their business. A portion of the contents of the 30 drums received at the plant in April was thereafter employed by the plaintiff in the manufacture of products at its plant, which were sold in due course and delivered by it to its customers. Use of the balance was discontinued upon receipt by plaintiff of notice that the Prohibition Administrator objected. That balance is still on hand at the plant.

There is testimony in the record, some of it disputed, which would support or tend to support the following: The Wood Products Company on March 11, at Buffalo, analyzed the alcohol it shipped and ascertained it to be wood alcohol of denaturing grade. There was no substitution for this alcohol, either while the drums were being moved from the premises of the Wood Products Company to the station of the Erie Railroad at Buffalo, or between the time the railroad received the articles and delivered them at New York to the truckman of the plaintiff, or between the time they were delivered by the railroad to plaintiff's truckman and his delivery of them to the Everard warehouse, or while they were in the possession of the warehouse, or during their removal by the truckman from the warehouse to plaintiff's plant, or during the time they were in the plant of the plaintiff. Some of the witnesses say that there were

discrepancies in several respects in the markings stenciled on the drums as they left the hands of the Wood Products Company and the markings stenciled on 12 of the drums remaining in plaintiff's plant when photographed there on May 8. One variance stated by the witnesses is as to the gallonage of the drums. At one time the Wood Products Company shipped in drums marked to contain 52 gallons. The bill rendered by it to and paid by plaintiff is for drums of 53 gallons each. The photographs of the 12 drums remaining in the plant in May carried the marking of 52 gallons. There is testimony tending to show that the Wood Products Company on February 19 discontinued use of drums marked as containing 52 gallons and thereafter shipped only in drums marked as containing 53 gallons. On the other hand, an employé of the Wood Products Company, who said in substance that the markings on the drums as photographed in the plaintiff's plant were of the type which up to February 19 were used by the Wood Products Company, also said that the markings he examined on May 10 at plaintiff's plant looked like the markings on drums handled by the Wood Products Company. He further testified that the drums found at the plaintiff's plant on May 10 were new and of a kind which the company had ceased to use three years earlier.

The government chemists who examined samples taken from the 15 drums which reached the plant on April 1 and from the 15 drums which reached there on April 22, as well as samples taken on several occasions later from a portion of one or the other of the two lots, some of which were drawn after the controversy arose, testified that the samples were of alcohol not coming up to the government requirement for denaturing grade and were of a kind from which it would have been possible by distillation to recover alcohol for beverage purposes. A chemist of the Wood Products Company, who examined samples taken from 12 of the drums at the plant on May 14, testified that they were substandard and that the alcohol in those drums was not the same as that examined March 11 and shipped March 13 at Buffalo. As previously stated, the certificates, furnished in the name of Charles F. Daub by the Fergerson Laboratories, of the test of samples taken on the days the two lots arrived at the plant, were to the effect that the samples from each lot were wood alcohol of denaturing grade as required by the government. Daub had left the service of the Fergerson Laboratories in June, 1928,

and his name had been signed to the certificates by Mrs. Fergerson, who was connected with the laboratories, in reliance (as she said) upon examination of the samples by another chemist. It does not appear that either the government officials or the officers of the plaintiff had knowledge previous to the present controversy of Daub having left the service of the Fergerson Laboratories or that thereafter his name had been forged to certificates of analyses. Samples taken by the storekeeper gauger on arrival of each consignment were furnished to plaintiff. It is not shown whether these were subjected to separate examination by chemists.

Government employés stationed at or visiting the plant testified that they had never observed any misconduct by the plaintiff. There was also testimony to the effect that the plaintiff was without knowledge of or blame for the alcohol being substandard (if it was so); also that plaintiff had not diverted the alcohol shipped from Buffalo, had made no substitution for it, and had acted in good faith throughout.

10. From the foregoing it is plain that if the proof summarized were before a court, upon the issue of whether there had been misbehavior by plaintiff, in a case in which the parties were entitled to a jury trial, it is of the precise kind which necessarily must be submitted to the jury. It is not of the kind upon which the court could properly direct a verdict.

The proof would leave it open to a jury to find the following: (a) The alcohol shipped from Buffalo was wood alcohol of denaturing grade; (b) the alcohol used by plaintiff at its plant, of which samples were taken, was not the article shipped from Buffalo, was below denaturing grade, and was capable, by manipulation, of being made potable; (c) through previous dealings plaintiff was familiar with the type of and markings on drums used by the Wood Products Company in shipping alcohol; (d) from the nature of the markings on the drums, as well as from the type of the drums themselves, received at its plant, the plaintiff was put on immediate inquiry as to whether there had been a substitution of substandard product for the standard product it had ordered from the Buffalo seller; (e) from having in hand samples of the goods as they actually came to the plant, coupled with the use of a discontinued type of Wood Products Company drums and a difference in the marking on the drums received of gallonage from the gallonage paid for and differences in marking in other respects, the plaintiff had knowledge

that a substitution of substandard product had been effected or itself had brought about the substitution.

It is true that, based upon the evidence, a jury might have reached, and would have been warranted in rendering, a verdict for the plaintiff. The burden of establishing its contention was upon the government. Many of the witnesses for the government, both in and out of its employment, were open to attack for bias and what they said might reasonably have been rejected at least in part. It would have been peculiarly within the province of a jury to determine the weight that should be given to the testimony of such witnesses.

It is true also that there was no direct evidence of bad faith on the part of the plaintiff and that there was direct evidence of good faith on its part. Quite frequently, however, knowledge or intention is not shown, and is not capable of being shown, by direct evidence, and whether or not there has been bad faith rests exclusively upon inference and is to be ascertained from all the circumstances in evidence.

It follows that it was for the executive officials to decide whether or not the Wood Products Company shipped to the plaintiff wood alcohol of denaturing grade; if so, whether there was substitution for it of substandard alcohol; and, if so, whether plaintiff was privy to the substitution. If this be true, then the provisions for court review prescribed by sections 5 and 9 of title 2 of the Prohibition Act (27 USCA §§ 14, 21), as authoritatively construed in Ma-King Co. v. Blair, 271 U. S. 479, 46 S. Ct. 544, 70 L. Ed. 1046, do not allow, and indeed prevent, this court from going into the facts. The scope of review by this court, as defined in the Ma-King case (page 483 of 271 U. S., 46 S. Ct. 544), is to determine whether the decision of the Prohibition Administrator was either (a) based on error of law or (b) wholly without support in the evidence or (c) plainly arbitrary or capricious. Careful reading of Smith v. Foster (D. C.) 15 F.(2d) 115, relied on by plaintiff, will disclose that it was not held there that a de novo trial is permissible where there had been a hearing before the prohibition administrator, at which evidence adequate to sustain the finding of fact was adduced.

There can be no pretense here that the Prohibition Administrator committed error of law. It is clear beyond peradventure that there was some evidence from which he could conclude that the wood alcohol shipped from Buffalo by the producer was of denaturing grade and reached the plaintiff. There was likewise evidence from which he could conclude that, after the product thus came into the hands of the plaintiff, there was a substitution therefor by plaintiff, or at plaintiff's instance, of alcohol which was below denaturing grade. The evidence is such that it does not appear, either clearly or otherwise, that in making such finding the result was either arbitrary or capricious on the part of the Prohibition Administrator. The presence of evidence, tending to support the finding of fact, in and of itself, necessarily negatives characterization of the finding as arbitrary or capricious.

As previousyly indicated, there was before the Prohibition Administrator ample evidence from which different conclusions might have been reached by him. For example, there would have been justification for his finding that the markings stenciled on the drums examined at the plant were put there by the Wood Products Company. So also it was open to the Prohibition Administrator from the evidence to conclude that the alcohol actually used by the plaintiff, of which samples were tested by the government, was the identical article that the Wood Products Company had shipped from its plant and that, if it was substandard, the fault was that of the Wood Products Company. Similarly, assuming that substitution for the articles which left the Wood Products Company occurred at some time previous to the government taking samples at plaintiff's plant, it was open to the Prohibition Administrator to conclude that the substitution occurred, without the knowledge or connivance of the plaintiff, at some stage previous to the shipment reaching the plant. The fact, however, that different conclusions than those reached by the Prohibition Administrator were open to him, is no ground for the court to disregard the findings on which revocation of the permit rests or for the court to set them aside.

As already stated, my own feeling is that the real truth about this matter cannot be discovered by this court without having the witnesses before it for oral hearing and subject to cross-examination. It would do violence, however, to the provisions of the Prohibition Act, as the meaning of those provisions has been settled by the Supreme Court, for this court, either because it is in doubt as to whether the findings of fact of the Prohibition Administrator are correct or because its view on the facts is different from

that of the Prohibition Administrator, to nullify the Prohibition Administrator's conclusion.

■ 11. In support of its contention that the course of the prohibition officials toward it has been oppressive, the plaintiff argues in substance as follows:

(a) The ground assigned by the Prohibition Administrator for refusing to renew the permit during 1929 was without any basis. The application for the renewal was made August 1; yet no notice of hearing was given until December 11, 1928. When notice was given it was in merely general terms and the date set for the hearing was December 28. The disapproval was withheld until two days before commencement of the new year.

(b) On January 29, 1929, this court granted a temporary injunction which had the effect of allowing the plaintiff to continue operations under its 1925 permit until final decision in the first suit. Immediately following the award of that injunction, as disclosed by correspondence between the plaintiff and the Prohibition Administrator, commencing February 1, 1929, and continuing to April 25, 1929, the Prohibition Administrator cut down the supply of alcohol to plaintiff under the permit to such an extent as to render profitable operation of the plant impossible, and on the latter date cut off the supply altogether.

(c) The investigation which resulted in the revocation of plaintiff's permit was initiated after the filing of a petition to punish the Prohibition Administrator for disobeying the injunction in the first suit. If the Prohibition Administrator believed that there was fault in the alcohol at plaintiff's plant, he had a choice whether to act under section 5 or section 9 of title 2 of the Prohibition Act. Under the former there would have been no interference with the injunction, and the regulations provided that plaintiff be afforded a chance to correct the quality of the article by remanipulation. He elected to bring the proceedings embraced in the second suit in such form that the purpose of the injunction was wholly frustrated, because section 9 in express terms deprived the court of power, during the pendency before it of an action to review the revocation of a permit, to grant a temporary injunction.

It would be enough to say in response to this contention of the plaintiff that, if all it says as to the facts were conceded, it is wholly irrelevant to any issue in the second suit. Even if, in the respects mentioned, the Prohibition Administrator acted arbitrarily or capriciously, that would not deprive him of the power, explicitly conferred by Congress, in the absence of committing an error of law, and upon adequate evidence presented to him, even though contradicted, to decide, within the sense of section 9 of title 2 of the Prohibition Act, whether plaintiff had intentionally violated or had not in good faith conformed to that statute. Inasmuch as, in the way previously pointed out, the Prohibition Administrator had before him enough to warrant him in concluding that the charges involved in the second suit were sustained, this court cannot interfere merely because of the fact, if it should find it to be the fact, that the Prohibition Administrator has misconducted himself.

It is true also that the terms of the injunction in the first suit do not prohibit, and could not properly prohibit, the institution and maintenance by the Prohibition Administrator of proceedings to revoke the permit for subsequent misconduct by the permittee. For the Prohibition Administrator it is argued therefore that there is no warrant for condemning his course. This answer, however, misses the point of the criticism. It is not urged that he lacked legal authority to revoke the permit continued in effect by the injunction, but the proposition urged is that the way in which the whole matter happened earmarks it with bad faith on his part.

I regret to say that I do feel that there is enough in the record to compel the court to feel that there is at least ground for suspecting that the prohibition officials, after the award of the injunction in the first suit, deliberately set out to deprive the plaintiff of any benefit thereof. Yet, as heretofore stated with respect to the charges against the plaintiff, so now I must say of plaintiff's complaint against the Prohibition Administrator, that the Prohibition Act as interpreted by the Supreme Court prevents this court from converting either suit into a plenary form which would enable it confidently to feel that it had gotten the whole truth or reached a just result. The court recognizes the difficulties with which the Prohibition Administrator is confronted and has the obvious duty to lend him its support when invoked in proper cases. Nevertheless, upon the present record and in the present form of the litigation, this court feels unable either to convict or to acquit the Prohibition Administrator of the criticism aimed at him by the plaintiff.

So far therefore as concerns the charge of the plaintiff that it has suffered from oppression by the prohibition officials, the forum for determining it is executive, and the remedy, if any, is in the hands of the executive branch of the government.

12. There are numerous other points of controversy. All have been considered. None go to the heart of the matter or furnish plaintiff ground of relief in either suit. It would unduly extend this statement to cover them by comment.

It follows that both bills must be dismissed.